UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
http://www.flmb.uscourts.gov

In re:

The Farm, LLC,                     Case No.: 6:24-bk-00362-LVV
                                        Chapter 11, Subchapter V

        Debtor.
_____/

**United States Trustee's Objection to Debtor's Second**
**Amended Chapter 11 Plan of Reorganization (Doc. No. 424)**

Mary Ida Townson, United States Trustee for Region 21 (the "U.S. Trustee"), by and through the undersigned counsel, objects to the Debtor's Second Amended Chapter 11 Plan of Reorganization ("Plan"; Dkt. 424), and states:

**Summary**

The Court should not confirm Debtor's Plan because it is not feasible. Debtor's use of third-party Stripe accounts and non-DIP bank accounts concealed that it has averaged a monthly net income of -$24,737.32 since the Petition Date. Total cash flow from the Petition Date to September 30, 2024 was -$197,898.56. From June 01 through August 31, 2024, undisclosed payments were made in excess of $200,000.00 to pay expenses incurred related to Debtor's properties and operations. Accordingly, Debtor's monthly operating reports ("MORs") were grossly inaccurate and did not accurately reflect Debtor's monthly disbursements for expenses and cash flow. Thus, creditors have voted for or against the Plan based on inaccurate and misleading information.

In addition, third party TFCE, LLC appears to have retained wrongfully

$210,880.61 of Debtor's funds received through TFCE's Stripe account that cannot be attributed to Debtor-related expenses or Stripe's mandatory revolving reserve.

Debtor would need approximately $36,832.71 in cash each month to sustain all payments under the Plan. Based on the Debtor's past performance, Debtor has shown it will not have the cash flow to sustain these payments and will likely result in further reorganization or liquidation. Further, Debtor has no explanation for why it is projecting a sudden decrease in projected monthly expenses of almost fifty percent.

Simply put, Debtor's actual performance during the first eight months of this case does not support the Plan or projections. The Plan and projections are clearly a pipe dream with no reasonable prospect of success. The Plan is unconfirmable pursuant to 11 U.S.C. §§ 1129(a)(11) and 1191.

## Factual Background

1. On January 24, 2024 ("Petition Date"), Debtor filed its voluntary petition for relief under chapter 11 of title 11 of the Bankruptcy Code. Debtor elected to proceed under Subchapter V. (Dkt 1)  The U.S. Trustee appointed L. Todd Budgen as Subchapter V Trustee. (Dkt 6)

2. September 18, 2024, the Debtor filed its Second Amended Chapter 11 Plan of Reorganization ("Plan"). (Dkt 424)

3. On October 21, 2024, the U.S. Trustee held a Rule 2004 examination where Jacob Martin appeared and testified under oath as the Debtor's corporate representative. Among other things, Mr. Martin testified as to Debtor's use of third parties for property management services from June 01, 2024 to August 31, 2024, including credit card

processing and payment of expenses related to Debtor's operations and leased properties.

A.      **Debtor's Use of Third Party Credit Card Processing Accounts**

4.      According to Debtor, "95 percent of Debtor's revenue is tendered to the Debtor by credit or debit card." *Verified Disclosure Regarding Debtor's Cash Management System* ("Discl.") ¶2. (Dkt 402) Prepetition and postpetition until May 30, 2024, Debtor received credit card payments from its customers through the services of third-party credit card processor Ten Twenty Four, Inc. d/b/a Beyond Pricing. Debtor was in contractual privity with Ten Twenty Four, Inc. and was the "merchant of record." *Discl.* ¶¶3-5.

5.      On or around May 30, 2024, Ten Twenty Four informed the Debtor that Ten Twenty Four would no longer process credit card payments for Debtor because of the amount of Debtor's customer chargebacks. *Discl.* ¶¶4-5. Thereafter, due apparently to Debtor's financial distress and the volume and amount of chargebacks, Debtor "[r]ealized it was seemingly impossible to obtain a new credit card processor . . . ." *Discl.* ¶8.

6.      At that time, the three principals of the Debtor, two siblings and their mother (Katie Martin Loane (CFO), Jacob Martin (CEO), and Angela Martin (COO)), also co-owned non-debtor entity TFCE, LLC ("TFCE") in the same membership ratios. TFCE did not have operations but did have a Stripe account.

7.      Beginning June 03, 2024, TFCE used its Stripe account to process Debtor's credit card payments, and thereafter Stripe deposited the funds into TFCE's Bank of America account ending 9486 (the "BoA Account"). Debtor claims that TFCE began doing so in its capacity as Debtor's property management company, and that Debtor engaged TFCE to provide Debtor with "comprehensive property management services." *Discl.* ¶9.

8. In late July 2024, Stripe informed TFCE that it would be imposing a fifty percent mandatory rolling reserve ("MRR") requirement due to the high number of Debtor's chargebacks on the account. Debtor therefore began using the Stripe account of non-debtor USAStays, Inc., whose sole shareholder is Jacob Martin. That Stripe account was tied to USAStays' account at Regions Bank, where Stripe deposited Debtor's credit card funds thereafter. Debtor alleges that it verbally engaged USAStays to provide Debtor with "comprehensive property management services" as well.

9. On September 11, 2024, after the U.S. Trustee raised concerns to the Court regarding Debtor's use of third-party Stripe and non-DIP bank accounts, Debtor filed a Supplemental Declaration of Jacob Martin Regarding Debtor's Cash Management System (Dkt 414). Therein, Debtor declared that as of August 31, 2024: (i) all credit card payments for Debtor were being processed through Debtor's own new Stripe account; (ii) Stripe was depositing the income directly into Debtor's DIP bank account; and (iii) TFCE and USAStays had ceased processing credit card payments for Debtor. (*Id*. at 1)

10. TFCE however, was still holding a balance of $42,955.19 in the MRR, which was to be used to process the refunds of the Debtor's customers for prepaid reservations that became cancelled (*Id*. at 2). Debtor expects the MRR to likely be depleted by refunds and has not received any funds from the MRR to date.

**B.     Debtor's Use of Third Party Credit Card Processing Accounts and Third Party Non-DIP Accounts Hid Debtor's True Disbursements for Expenses**

11. The Debtor's Monthly Operating Reports ("MOR") since February 2024 state the following summary of cash activity for all accounts:

| Chart A | Jan/Feb | Mar | Apr | May | June | July | Aug | Sept |
|---|---|---|---|---|---|---|---|---|
| Receipts | $717,743.51 | $574,769.86 | $627,317.78 | $611,603.14 | $319,307.94 | $447,206.66 | $154,002.78 | $159.308.02 |
| Disbursements | -$677,360.93 | -$612,519.96 | -$625,446.33 | -$609,649.88 | -$308,533.51 | -$394,308.17 | -$163,284.78 | -$213,779.52 |
| Net Cash Flow | $40,382.58 | -$37,750.10 | $1,871.45 | $1,953.26 | $10,774.43 | $52,889.49 | -$9,281.29 | -$54,471.50 |

*See* Docs. Nos. 123, 186, 236, 293, 363, 407, 438, and 439.

12. However, the analysis of documents produced by the Debtor, including Debtor's DIP account statements, TFCE's Bank of America statements and QuickBooks reports, and USAStay's QuickBooks reports, show that Debtor under-reported its disbursements/expenses grossly. Debtor only included in the MORs disbursements for expenses that were made from its DIP Account. But Debtor failed to disclose to the parties and the Court that TFCE and USAStays also paid Debtor's expenses from their respective bank accounts from amounts they received from Debtor's customers.

13. At the 2004 examination, Debtor's representative—Jacob Martin—testified that TFCE and later USAStays orally agreed to be Debtor's property managers and that their comprehensive property management services included handling all of Debtor's day-to-day operations and guest servicing requirements, processing short-term lessees' creditor card payments through their respective Stripe accounts, and paying all expenses related to Debtor's operations.

14. TFCE and USAStays allegedly paid to Debtor all amounts they received from Debtor's customers less Debtor's expenses. Debtor claims that to the extent TFCE or USAStays made payments to the Debtor without deducting such expenses, those payments to Debtor's creditors were "gifts" to Debtor from TFCE and/or USAStays. *J. Martin Exam.* 134:15-163:3 None of Debtor's expenses that were paid from TFCE's BoA Account or

USAStay's Regions Account have been accounted for in the MORs nor have the "gifts."

15. When one adds to Debtor's disbursements the expenses paid by TFCE and USAStays, Debtor's cash flow is very different.

| Chart B | Jan/Feb | Mar | Apr | May | June | July | Aug | Sept |
|---|---|---|---|---|---|---|---|---|
| Receipts | $717,743.51 | $574,769.86 | $627,317.78 | $611,603.14 | $319,307.94 | $447,206.66 | $154,002.78 | $159.308.02 |
| Disbursements | -677,360.93 | -$612,519.96 | -$625,446.33 | -$609,649.88 | **-$359,121.77** | **-$428,490.65** | **-$282,789.21** | -$213,779.52 |
| Net Cash Flow | $40,382.58 | -$37,750.10 | $1,871.45 | $1,953.26 | **-$39,813.83** | **$18,716.01** | **-$128,786.43** | -$54,471.50 |

16. In total, the Debtor has generated $3,611,259.69 in gross receipts, made $3,809,158.25 in expense disbursements, and had a negative net cumulative profit of -$197,898.56. For the eight months this case has been pending, Debtor's average monthly income was negative, specifically **-$24,737.32.**

C. **Debtor's Use of Third Party Credit Card Processing Accounts and Third Party Non-DIP Accounts Resulted in a Wrongful Depletion of Debtor's Funds**

17. Debtor alleges that TFCE and USAStays agreed to "provide an extensive array of property management services so that they would be able to handle most of the day-to-day operations of the properties and they would not charge any – any income based fee for their service. They would only deduct the expenses they incurred and that they would remit any remaining, I guess you know, balance to the Farm." *J. Martin Exam.* 112:1-7. "They had essentially unlimited licensure from us to – to pay any expenses that might would be reasonably associated with operating the Farm, LLC's properties. They were not permitted to retain any commission or fee for their work." *Id.* at 113:18-23.

18. The analysis of Debtor's banks statements, TFCE's BoA statements, and QuickBooks reports for both TFCE and USAStays reveals that TFCE did not disburse to

the Debtor all funds to which Debtor was entitled.

19. TFCE and USAStays received into their respective bank accounts a total of $1,100,321.60 due to Debtor's use of their Stripe accounts. They paid a total of $204,275.88 in expenses associated with operating Debtor's properties. They paid directly to Debtor only $712,811.19. Thus, Debtor was underpaid. Specifically, **TFCE underpaid Debtor $210,880.61, which is owed to Debtor**.[1] USAStays overpaid Debtor $27,646.08.[2]

## Law and Argument

I. **The Plan Is Not Feasible Because the True Picture of Debtor's Expenses Reveals that Debtor Will Not Have Sufficient Monthly Income to Support the Plan; It Has Been and Will Likely Continue to be Cash Flow Negative**

Debtor has not proposed a feasible plan. 11 U.S.C. Section 1129(a)(11) requires the Court to determine that confirmation of the plan of reorganization "is not likely to be followed by the liquidation, or need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11).

This requirement "is designed primarily to prevent confirmation of visionary schemes that promise a greater distribution than the debtor or plan proponent could ever attain." *In re JRV Indus., Inc.*, 344 B.R. 679, 683 (Bankr. M.D. Fla. 2006). "The use of the

---

[1] According to Debtor's DIP account statements, and TFCE's BoA account statements and QuickBooks report: (i) Stripe transferred $950,798.13 into the BoA Account for credit card payments processed for TFCE as Debtor's alleged property manager; (ii) TFCE paid $9,7681.03 of expenses incurred related to Debtor's operations and leased properties; and (iii) TFCE transferred to Debtor $642,236.49.

[2] Debtor testified that any overpayments by TFCE or USAStays were "gifts" to the Debtor. *J. Martin Exam.* at 134:15-163:3. Notably, this overpayment by USAStays includes $9,880 that USAStays paid to Debtor in July 2024, described as "prefund" in the DIP account statement, before USAStays allegedly began providing Debtor with property management services. In July 2024, USAStays received no funds related to Debtor's properties nor did it pay any expenses related to Debtor's properties.

word, likely, requires the Court to assess whether the plan offers a reasonable 'probability of success, rather than a mere possibility.'" *In re Diplomat Constr., Inc.*, 2009 Bankr. LEXIS 4250, 2009 WL 6498180, at *2 (Bankr. N.D. Ga. Nov. 20, 2009) (quoting *In re Kent Terminal Corp.*, 166 B.R. 555, 560 (Bankr. S.D.N.Y. 1994)). That is, the proponent must show the plan offers "a reasonable prospect of success and ... is workable." *In re D & G Invs. of W. Florida, Inc.*, 342 B.R. 882, 885 (Bankr. M.D. Fla. 2006).

For Year One, Debtor projects total expenses of $1,544,166.00 for an average monthly expense of $128,680.00. As reflected in Chart B above, Debtor's past monthly expenses exceeded greatly the projected amount for Year One. Even if one looks at just August and September, which is after the significant reduction in Debtor's leased property inventory, Debtor's average monthly expenses was $248,284.36. Debtor provides no explanation for why its expense projections are nearly half that amount.

In the Plan, Debtor proposes to pay non-ordinary administrative claims over five years from the Plan's effective date (*Id.* at 13). Without knowing the final administrative fee applications of the Subchapter V Trustee and the Debtor's accountant, the administrative claims totaling $1,089,775.00 (as described within the Plan's Liquidation Analysis) will require monthly payments of $18,162.92. Based on the Debtor's average performance, Debtor would not be able to sustain the administrative payments along with the additional plan payments to creditor classes.

The Debtor would need approximately $36,832.71 in cash each month to sustain all payments under the Plan. Based on the Debtor's MORs and past performance, the Debtor has shown it will not have the cash flow to sustain these payments and this will

likely result in further reorganization or liquidation.

Debtor has not proposed a feasible plan. Debtor failed to disclose the full extent of its post-petition expenses/disbursements. Debtor's adjusted/corrected monthly operating report amounts (Chart B above) never come close to meeting Debtor's projections. Indeed, Debtor was cash flow negative for four of eight months, and monthly cash flow has not exceeded $18,716.01 since the first month of this case. Further, Debtor has no reasonable explanation for projecting a sudden fifty percent decrease in monthly expenses.

Simply put, Debtor's actual performance during the first eight months of this case does not support the Plan or projections. The Plan and projections are clearly a pipe dream with no reasonable prospect of success.

**II.     Other Plan Issues**

There are three additional problems with the Plan. First, creditors were unable to make an informed decision when voting to accept or reject the Plan because Debtor failed to accurately reflect the Debtor's true post-petition financial performance in its MORs, specifically the undisclosed expenses paid by third parties and the extent of Debtor's negative cash flow. Without that information, creditors did not have Debtor's true post-petition financial performance with which to evaluate Debtor's plan projections and ability to make Plan payments.

Second, Article VII(D) of the Plan states:

> The Debtor, and the Reorganized Debtor, for the purpose of consummating and implementing the transactions and acts contemplated by this plan, shall have no liability to any entity for any act taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, implementation, confirmation or consummation of the initial Plan, or any contract, instrument, release or other agreement or document relating to,

9

rising out of or in connection with the Plan, unless the liability of any entity that would otherwise result from any such act or omission was the result of gross negligence, fraud, or willful misconduct.

This limitation of liability is restricted by its own terms to the period between the Petition Date and the date of confirmation. By the terms of Plan, the "Reorganized Debtor" does not come into existence until after the date of confirmation. Therefore, the Reorganized Debtor should be excluded from Article VII(D).

Third, the Plan is objectionable in that Debtor has proposed a five-year plan but has only provided three years of projections.

## Conclusion

For all the foregoing reasons, the Court should sustain the United States Trustee's Plan objection, dismiss or convert the case, and take such other just and proper actions. Debtor's actual performance during the first eight months of this case, which was hidden from the parties, does not support the Plan or projections. The Plan and projections are clearly a pipe dream with no reasonable prospect of success

Dated:  October 25, 2024.

Mary Ida Townson
United States Trustee Region 21

*/s/   William J. Simonitsch*
William J. Simonitsch, Asst. U.S. Trustee
Florida Bar # 0422060
Bryan E. Buenaventura, Trial Attorney
Florida Bar # 1022175
Office of the United States Trustee
U.S. Department of Justice
400 W. Washington St., Suite 1100
Orlando, FL 32801
Telephone No.:  (407) 648-6301
Email: William.J.Simonitsch@usdoj.gov

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing objection has been served electronically through CM/ECF on October 25, 2024, to all parties having appeared electronically in the instant matter and by First Class mail on the following.

The Farm, LLC
601 Sycamore Street Unit 6106
Kissimmee, FL 34747

                                                                           */s/ William J. Simonitsch*
                                                                          William J. Simonitsch, AUST